UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
_____
                              :
CALVIN N. MAULTSBY,           :
                              :   Civil Action No.
              Plaintiff,      :   09-4376
                              :
        v.                    :   OPINION
                              :
RIH ACQUISITIONS NJ, LLC,     :
d/b/a, Atlantic City Hilton   :
                              :
              Defendant.      :
_____   :
```

Appearances:

CHRISTINE A. CAMPBELL
GERALD J. WILLIAMS
WILLIAMS CUKER BEREZOFSKY
Woodland Falls Corporate Center
210 Lake Drive East
Suite 101
CHERRY HILL, NJ 08002-1163
*Attorneys for Plaintiff*

FRANCES WANG DEVENEY
MARKS, O'NEILL, O'BRIEN & COURTNEY, PC
COOPER RIVER WEST
6981 N. PARK DRIVE
SUITE 300
PENNSAUKEN, NJ 08110
*Attorney for Defendant*


**HILLMAN, District Judge**

Before the Court is defendant's motion for summary judgment on plaintiff's claims of racial discrimination pursuant to 42 U.S.C § 1981, the New Jersey Law Against Discrimination, common law tort of malicious prosecution, and intentional

infliction of emotional distress.  For the reasons explained below, defendant's motion will be granted.

## I.  <u>BACKGROUND</u>[1]

On December 29, 2007, at approximately 7:10 a.m., plaintiff Calvin Maultsby, an African-American, entered the Atlantic City Hilton ("Hilton") casino with the intention of having a complimentary breakfast at the Chairman Club when it opened at 8:00 a.m.  Plaintiff had been granted "Elite Player Status" by the Hilton and was eligible to receive complimentary meals.  While waiting for the Chairman Club to open, plaintiff walked through various locations on the casino floor and spoke

---

[1]     Pursuant to Local Rule 56.1, the party filing a motion for summary judgment must file a statement of material facts not in dispute in separately numbered paragraphs.  <u>See</u> Local Civ. R. 56.1.  The opponent shall furnish a responsive statement of material facts, addressing each paragraph and "indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents" submitted with the motion.  Any material fact not disputed "shall be deemed undisputed" for purposes of deciding the motion.  <u>Id.</u>  For numbered paragraphs 6, 8, 10, 17, 18, 24, and 51, plaintiff stated "neither admitted nor denied" but provided no explanation or reference to the record.  For numbered paragraphs 11, 22, and 48, plaintiff stated "neither admitted nor denied" and made some comment or reference to the record. Plaintiff's statement that a material fact is neither admitted nor denied does not comply with local or Federal rules.  <u>See</u> Local Rule 56.1; Fed.R.Civ.P. 56©).  For numbered paragraphs 16, 19, and 26, plaintiff simply stated "denied" without any citation to the record, which also fails to comply with local and Federal rules.  <u>See</u> <u>id.</u>  For those statements of facts for which plaintiff did not properly deny with a citation to the record, and for which the Court finds supported in the record, the Court deems them admitted.  <u>See</u> Local Rule 56.1 (a); Fed.R.Civ.P. 56(e)(2) and (3).

with an acquaintance who was at a craps table.  Plaintiff did not gamble at this time, but watched others gamble as he waited for the Chairman Club to open.

At approximately 7:20 a.m., Lorna Dixon, a Hilton security officer, and two other female security personnel, approached plaintiff and told him that a casino patron had complained that plaintiff had asked her for money.  Plaintiff denied the accusation and told Ms. Dixon that he was waiting for the Chairman Club to open, that he had money on his person (approximately $1,500), and presented Ms. Dixon with his Hilton Elite Player card along with his New Jersey state identification card.  He also asked that he be taken to the accuser who he believed identified him in error.[2]

Ms. Dixon declined to bring him to the person who identified him but took his Hilton Elite Player card and brought it to the security podium for verification.  The Hilton Elite Player card contained plaintiff's complete name and a validity date through January 31, 2008.  Slot Shift Manager Carmella Marcheski who was the supervisor at the security podium looked up

---

[2]    In fact, the identification of plaintiff was in error. Plaintiff states that the surveillance tapes show a tall African American woman or man had approached the complaining patron and asked her for change.  This person was wearing a coat and head covering similar to the coat and hat that plaintiff had on at the time.  Although the patron apparently identified the plaintiff as the person who asked her for money, the surveillance tape indicates the panhandler was another person.

plaintiff's card on the computer.  Ms. Marcheski found a notation in the computer under plaintiff's account stating "Notify Surveillance and Shot Shift Manager to observe all slot play."[3] Ms. Dixon returned to the area where the complaining woman had been and learned that she had left.  Ms. Dixon returned the Hilton Elite Player card to plaintiff.

During this time, Security Supervisor Deborah Feldman approached Ms. Dixon and learned of the accusation against the plaintiff and the status of his Hilton Elite Player card.  Ms. Feldman approached plaintiff and told him that she needed to validate his Hilton Elite Player card.  Plaintiff gave his card to Ms. Feldman who then proceeded over to one of the gambling tables.  Ms. Feldman checked the status of plaintiff's card and her inquiry revealed that his card was valid and had been awarded to him based on his craps play.

While Ms. Feldman held plaintiff's card, a heated exchange began between them.  Plaintiff maintains that he yelled over to Ms. Feldman to return his card.  Ms. Feldman states that plaintiff began yelling, waiving his arms, and approached her in a threatening manner.  Ms. Feldman testified that plaintiff's

---

[3] Plaintiff does not effectively deny, see <u>supra</u> note 1, that he has been ejected from several Atlantic City casinos on numerous occasions and arrested for various crimes and infractions including disorderly conduct, assault, loitering, and cheating on slot machines.  See Defendant's Statement of Uncontested Facts, ¶ 29-37.

behavior caused her to call for backup security assistance. Plaintiff states that even though Ms. Feldman confirmed the card was valid she told him "you're not getting your card back because you elevated your voice when you asked for it previously."

Ms. Dixon testified that she returned to the area where plaintiff was waiting and heard plaintiff and Ms. Feldman in a verbal exchange "going at each other."  Ms. Dixon testified that both plaintiff and Ms. Feldman were shouting at each other.  In Ms. Dixon's opinion, Ms. Feldman was "talking down" to plaintiff and plaintiff did not like the way Ms. Feldman talked to him. Ms. Dixon testified that neither plaintiff nor Ms. Feldman ever physically moved toward the other during this exchange.

Shift Manager George Cundari responded to Ms. Feldman's request for back-up.  Plaintiff approached Mr. Cundari and told him he wanted his card back.  Mr. Cundari testified that plaintiff was boisterous and was yelling toward Ms. Feldman who was "across the way," but that he did not physically threaten her.  Mr. Cundari told plaintiff to calm down.  Mr. Cundari testified that some of the patrons were disturbed by plaintiff's behavior but that he could not say anyone left the casino based on his behavior.  Mr. Cundari called security officer George Bethea as additional back up.

Mr. Cundari advised plaintiff that he was being ejected from the casino.  Plaintiff verbally protested that he did not do

anything, that the Hilton had no right to make him leave, that
Ms. Feldman did not know what she was doing, and that he wanted
his card back.  Plaintiff refused to leave the premises.  Mr.
Cundari told plaintiff he would be charged with trespassing or
disorderly conduct.  Mr. Cundari then requested that plaintiff
accompany him to the "command center" and told plaintiff that he
was notifying Gaming Enforcement.  Plaintiff went with Mr.
Cundari to the command center.  Department of Gaming Enforcement
Detectives, Robert Farr and Steven Jackson, arrived and a
complaint was lodged against plaintiff for disorderly conduct.

Five days after the incident at the Hilton, on January
3, 2008, plaintiff went to the emergency room at the AtlantiCare
Regional Medical Center.  The psychiatric intervention program
patient assessment form filled out that day includes a brief
description of the incident at the Hilton and states that
plaintiff became so angry following the Hilton incident that he
started having flashbacks of the Viet Nam war.  Plaintiff was
medically cleared on the same day and proscribed Prozac for
fourteen days.  Plaintiff also attended a few counseling sessions
with the Baltimore Veterans Center.

On October 3, 2008, plaintiff represented himself pro
se in municipal court in Atlantic City on the disorderly conduct
charge.  He was found not guilty.  Following the hearing,
plaintiff wrote to the Hilton describing what had happened at the

hearing and included a copy of his closing argument from the hearing.  The Hilton responded by calling the New Jersey State Police and by filing a complaint for terroristic threats.  After interviewing plaintiff on the telephone, plaintiff testified that he was told by the police officer that the complaint had no basis and the matter was closed.

Plaintiff brings this action against the Hilton asserting claims under 42 U.S.C § 1981, the New Jersey Law Against Discrimination, common law tort of malicious prosecution, and intentional infliction of emotional distress.  Hilton has moved for summary judgment on all these claims.

## II.  JURISDICTION

This Court exercises subject matter jurisdiction over plaintiff's federal civil rights claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and exercises supplemental jurisdiction over plaintiff's related state law claims pursuant to 28 U.S.C. § 1367.

## III. DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

7

as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56©).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. <u>Id.</u> In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." <u>Marino v. Industrial Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004) (quoting <u>Anderson</u>, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Id.</u> Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57. A party opposing summary judgment must do more than

8

just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

### B.    Racial Discrimination under 42 U.S.C § 1981

Section 1981 provides, in pertinent part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts ... as is enjoyed by white citizens...." 42 U.S.C. § 1981.  The statute covers private acts of racial discrimination.  Runyon v. McCrary, 427 U.S. 160, 170, 96 S.Ct. 2586, 2594, 49 L.Ed.2d 415, 424 (1976).  "A successful section 1981 claim requires proof of intentional discrimination."  Chauhan v. M. Alfieri Co., Inc., 897 F.2d 123, 126 (3d Cir. 1990) (citations omitted).  A plaintiff may prove discriminatory intent with direct evidence or indirect evidence.  Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 267-68 (3d Cir. 2010) (applying direct evidence test in Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to lending discrimination claims brought under § 1981).

Plaintiff does not offer direct evidence of discriminatory intent.  See Anderson, 621 F.3d at 269 (finding requirements for direct evidence to be a "high hurdle" and that

direct evidence must satisfy two requirements: (1) the evidence must be strong enough to permit the factfinder to infer that a discriminatory attitude was more likely than not a motivating factor in the defendant's decision"; and (2) the evidence must be connected to the decision being challenged by the plaintiff (and must be made at a time proximate to the challenged decision and by a person closely linked to that decision).  Rather, plaintiff appears to rely on indirect evidence using the McDonnell Douglas burden-shifting framework.

Courts interpreting Section 1981 claims apply the same McDonnell Douglas burden-shifting analysis applied in Title VII claims.  Anderson, 621 F.3d at 273 (applying burden-shifting framework in a Section 1981 lending discrimination claim); Santiago v. City of Vineland, 107 F.Supp.2d 512, 531 (D.N.J. 2000) (applying burden-shifting framework in a Section 1981 employment discrimination claim).  The burden-shifting framework is a three step process.  First, the plaintiff must establish a prima facie case of discrimination.  Anderson, 621 F.3d at 270-71.  If a plaintiff makes out a prima facie case, then the "burden of production shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the action."  Id. (citing Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 n. 2 (3d Cir. 1998)).  If the defendant meets its burden, then the burden of production shifts back to the plaintiff, who must show

10

by a preponderance of the evidence that the defendant's
explanation is pretextual.  Id.  "[T]hroughout this
burden-shifting paradigm the ultimate burden of proving
intentional discrimination always rests with the plaintiff."  Id.
(citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)).

A prima facie case for racial discrimination requires
that plaintiff show: (1) that plaintiff is a member of a racial
minority; (2) intent to discriminate on the basis of race by the
defendant; and (3) discrimination concerning one or more of the
activities enumerated in the statute, which includes the right to
make and enforce contracts.  Brown v. Philip Morris Inc., 250
F.3d 789, 797 (3d Cir. 2001).

Plaintiff, who is African-American, fulfills the first
element of a 1981 claim because he is a member of a racial
minority.  The second element requires that plaintiff allege acts
that show an intent by Hilton to discriminate against plaintiff
on the basis of his race.  Plaintiff has alleged that he was
ejected from the Hilton and accused of disorderly conduct on the
basis of his race.  In support of his claim, plaintiff argues
that when first approached by security officer Dixon, he
voluntarily turned over his Hilton Elite Player card for
verification.  His card was verified and returned to him.  At
this time, the complaining witness left the Hilton and, as Ms.
Dixon testified, without a witness the investigation should have

11

been dropped.

Instead, security officer Feldman requested that plaintiff give her his Hilton Elite Player card again.  Although there was a notation in the computer under plaintiff's account to "Notify Surveillance and Shot Shift Manager to observe all slot play," plaintiff was not playing the slots at that time.  There was no notation that showed the card was invalid or that plaintiff was barred from being in the casino.  Plaintiff argues that Ms. Feldman requested and held onto his card based solely on his race.  In support of this, plaintiff relies on the deposition testimony of security officer Ms. Dixon who testified:

> A.   I didn't like the way [Feldman] talked to people.  I
>      didn't like the way she talked - I didn't like the way
>      she handled people.
>
> Q.   Okay.  Did you also not like the way she handled
>      people, including African American people who were
>      guests at the casino?
>
> A.   Yes.
>
>      ...
>
> Q.   You said that you saw Ms. Feldman talking down to Mr.
>      Maultsby; is that right?
>
> A.   Yes.
>
>      ...

Q.   You felt that [Feldman] talked down to certain
     races; is that right?

A.   Yes.

Q.   And that included African Americans?

A.   Yes.

Q.   Did you feel [Feldman] targeted African Americans
     to evict from the casino?

     ...

A.   It doesn't have to be just black people.  Like I
     was saying, it's just – they look like they just
     was of no value.


     Plaintiff also relies on the testimony of Ms. Dixon and
Mr. Cundari who testified that he did not move towards Ms.
Feldman or physically threaten her.

     In response, Hilton argues that Ms. Dixon was a
disgruntled former employee.  Ms. Dixon had been terminated by
Hilton for leaving the scene of an investigation of theft and had
testified that she believed Ms. Feldman had her fired.  Although
these facts certainly call into question Ms. Dixon's credibility,
the credibility of a witness is a jury determination.  See U.S.
v. Rodriguez, 160 Fed.Appx. 246, 248 (3d Cir. 2005) (finding
credibility issue is a "task for the jury alone"); S.E.C. v.
Antar, 44 Fed.Appx. 548, 554 (3d Cir. 2002) (determining that

13

concerns regarding the credibility of witnesses cannot defeat summary judgment).  It would be for a jury to decide whether they believed Ms. Dixon's testimony or whether she is unreliable and biased.  Her testimony makes clear that in her view, based on her personal observations, Feldman treated racial minorities differently than others up to the point of challenging their presence in the casino and seeking their exclusion.  This is precisely the claim raised by Plaintiff.  Accordingly, plaintiff has plead sufficient facts to satisfy the second element.

The third element requires a showing of discrimination concerning one or more of the activities enumerated in the statute, including the right to make and enforce contracts. While most claims involving Section 1981 involve employment contracts, courts have recognized claims involving a contract for goods and services.  See Crane v. Cumberland County, Pa, 64 Fed.Appx. 838, 841 (3d Cir. 2003) (finding that while § 1981 prohibits racially motivated interference with the right to contract, the party bringing suit must seek to enter into a contract for goods or services); see also Patterson v. Averbeke, No. 10-996, 2011 WL 3919855, at *3 (E.D.Pa. Sept. 6, 2011) (finding plaintiff proved his prima facie case of Section 1981 violation where he alleged car dealer refused to sell him a car based on his race); Carney v. Caesar's Riverboat Casino, LLC, Nos. 07-0032, 07-0145, 2009 WL 363623, at *3 (S.D.Ind. Feb. 11,

14

2009) (deciding Section 1981 claim on allegation that plaintiffs were ejected from casino on the basis of their race); Turner v. Wong, 363 N.J.Super. 186, 832 A.2d 340 (App.Div. 2003) ("[Section 1981] applies to retail transactions as well as to formal contracts.").

Here, plaintiff held a Hilton Elite Player card which was an agreement by Hilton to provide the holder of the card with benefits or perks, such as complimentary meals, in exchange for the holder having participated in certain services at the casino such as in plaintiff's case, playing at the craps table. Plaintiff went to the Hilton with the intention of eating breakfast at the Hilton and, therefore, a contract for goods or services existed between the Hilton and plaintiff.

Plaintiff has alleged that he was discriminated against concerning this service contract when the Hilton refused on the basis of his race to allow him to remain in the Hilton and have a complimentary breakfast. Thus, the Court finds that plaintiff has alleged sufficient facts to make a prima facie case of discrimination. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("plaintiff's burden of establishing a prima facie case is not onerous.").

Having established a prima facie case under Section 1981, the burden shifts to Hilton to offer evidence of a

15

legitimate, nondiscriminatory reason for its action.  Hilton
states that another guest identified plaintiff as the person who
had asked her for money.  Hilton states that it conducted an
investigation based on that complaint, and that during its
investigation, plaintiff became boisterous, yelled at a security
officer, and disrupted other patrons in the casino.  Ms. Feldman
testified that based on plaintiff's behavior, she called for
back-up assistance.  Shift Manager George Cundari responded and
testified that plaintiff was boisterous and was yelling toward
Ms. Feldman who was "across the way."  Mr. Cundari instructed
plaintiff to calm down and called security officer George Bethea
as additional back-up.  Mr. Cundari advised plaintiff that he
would be ejected from the casino, but plaintiff refused to leave
the premises.

Mr. Cundari also advised plaintiff he would be charged
with trespassing or disorderly conduct.  Plaintiff verbally
protested to Mr. Cundari that he did not do anything, that the
Hilton had no right to make him leave, that Ms. Feldman did not
know what she was doing, and that he wanted his card back.  Mr.
Cundari then requested that plaintiff accompany him to the
"command center" and told plaintiff that he was notifying the
Department of Gaming Enforcement ("DGE").  Plaintiff went with
Mr. Cundari to the command center where DGE detectives Robert
Farr and Steven Jackson arrived and a complaint was lodged

16

against plaintiff for disorderly conduct.

Unlike Ms. Dixon's testimony concerning Ms. Feldman, there is no record evidence that Mr. Cundari's actions were racially motivated. Ms. Dixon, who testified that she felt Ms. Feldman talked down to or targeted African-Americans, testified that she did not believe that Mr. Cundari had any racial animus towards plaintiff when he evicted him nor had he shown such traits in the past. Specifically, Ms. Dixon testified:

> Q. Do you believe George Cundari ever treated people unfairly because of their race?
>
> A. Never.
>
> Q. How about their appearance?
>
> A. Never.
>
> ...
>
> Q. Do you believe Mr. Cundari evicted Mr. Maultsby because of his African American status?
>
> A. No.

While there are some discrepancies concerning the details, the Plaintiff does not seriously dispute that an altercation of some kind erupted on the casino floor between himself and Ms. Feldman. He admits, for example, that he shouted at her when she refused to return his card and that he was angry,

perhaps justifiably so, because he was being treated in a way that he thought was unfair.  In addition, there is undisputed testimony from both Mr. Cundari and Ms. Dixon, whose credibility Plaintiff relies on, that he was being disruptive on the floor of the casino, that Mr. Cundari tried to get him to calm down and leave but that plaintiff refused.  Thus, even if we view the evidence in the light most favorable to plaintiff and save for him all reasonable inferences, and further assume that a jury would find that Ms. Feldman acted with discriminatory intent, Mr. Cundari was justified in deciding to exclude him from the casino. The decision to evict plaintiff, and the actual eviction, was done by Mr. Cundari, not by Ms. Feldman.  Moreover, it was based in part on his own observations and those of Ms. Dixon.  In that way, Mr. Cundari's decision acts as an intervening and nondiscriminatory cause occurring subsequent to whatever events, even discriminatory ones, which may have precipitated the altercation.  Importantly, Plaintiff has not presented any evidence of discrimination by Mr. Cundari.[4]

_____

[4] Although not raised by the plaintiff, the Court also finds that plaintiff has not established sufficient facts to show he was ejected on the basis of his race using the Price Waterhouse "mixed motive" analysis applied in employment cases.  See Brown v. J. Kaz, Inc., 581 F.3d 175, 182 (3d Cir. 2009); E.E.O.C. v. Aldi, Inc., No. 06-01210, 2009 WL 3183077, at *10 (W.D.Pa. 2009) ("If the defendant employer instead acknowledges that there was discrimination but presents additional non-discriminatory reasons for the job action, then it is a mixed-motive case.").  Under the mixed motive analysis, plaintiff must present evidence of discrimination by a preponderance of the evidence, that "race,

Therefore, Hilton's investigation of plaintiff based on a witness identification, and subsequent ejection from the casino based on his disruptive and threatening behavior, is un-controverted evidence of a legitimate, nondiscriminatory reason for Hilton's actions.  Hilton having satisfied its burden, the burden of production shifts back to plaintiff who must show by a preponderance of the evidence that Hilton's explanation is pretextual.

Although plaintiff provided sufficient evidence to make out a prima facie claim, there is no evidence that Hilton's non-discriminatory explanation masks the true reason for Plaintiff's removal.  Plaintiff's evidence of racial discrimination pertains only to the actions of Ms. Feldman.  Indeed, plaintiff has presented evidence, through the testimony of Ms. Dixon, that Ms.

---

color, religion, sex, or national origin was a motivating factor" in the decision.  See Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (outlining standard in an employment mixed motive case).  Plaintiff having established so called "direct evidence" of discrimination, or the defendant having admitted to the discrimination, the defendant must then show that the decision would have been the same if race had not been part of the decision-making process.  Brown, 581 F.3d at 183; Aldi, 2009 WL 3183077, at *11.  At stated above, plaintiff has not presented direct evidence of racial discrimination as the basis for his ejection, and therefore, relies on the "pretext" theory and burden-shifting analysis under McDonnell Douglas.  Even assuming plaintiff has presented direct evidence of racial discrimination on the part of Ms. Feldman, Ms. Feldman did not make the decision to eject plaintiff and the decision by Mr. Cundari was not based on Ms. Feldman's actions or statements, but based on his personal observation.  In other words, the alleged racial motivation of Ms. Feldman did not play a factor at all in the decision to eject plaintiff from the casino.

Feldman's reason for continuing the investigation into plaintiff's status was racially motivated.  The basis of plaintiff's claim, however, is that he was ejected from the casino on the basis of his race in violation of Section 1981. While Feldman may have provided some information to Mr. Cundari, there is no evidence he shared her improper motive, acted at her direction, or failed to exercise independent judgment.  Rather, a reasonable juror could only conclude on this record that the decision to remove Plaintiff from the casino, made by Mr. Cundari and based in part on his own personal observation, was made without any racial animus or purpose of discrimination.

Thus, plaintiff has not shown by a preponderance of the evidence that Hilton's explanation is pretextual.  Therefore, defendant's motion for summary judgment with regard to plaintiff's Section 1981 claim will be granted.

## C.  New Jersey Law Against Discrimination

The New Jersey Law Against Discrimination ("NJLAD") provides that "[a]ll persons shall have the opportunity ... to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation ... without discrimination because of ... creed, ... subject only to conditions and limitations applicable alike to all persons."  See N.J. Stat. Ann. § 10:5-4.  "It is well-established that the LAD is intended to be New Jersey's remedy for unacceptable

20

discrimination and is to be construed liberally." <u>Franek v.</u>
<u>Tomahawk Lake Resort</u>, 333 N.J.Super. 206, 217 (App. Div. 2002).
The same burden-shifting analytic framework used to analyze
Section 1981 claims also applies to claims brought under the
NJLAD.  <u>Sarullo v. U.S. Postal Service</u>, 352 F.3d 789, 797 (3d
Cir. 2003); <u>Nieves v. Individualized Shirts</u>, 961 F.Supp. 782
(D.N.J. 1997); <u>Turner v. Wong</u>, 363 N.J. Super. 186, 210 (App.
Div. 2003) ("In interpreting the LAD, the federal law has
consistently been considered for guidance.").  Section 1981 and
the NJLAD seek to accomplish the same result even though Section
1981 is phrased in terms of a contract.  <u>Turner</u>, 363 N.J. Super.
at 209.

Applying the same burden-shifting framework as
described above, although plaintiff has alleged a prima facie
case of discrimination under the NJLAD, he has not demonstrated
facts sufficient to establish that Hilton's non-discriminatory
explanation for evicting him from the casino was pretextual.
Therefore, defendant's motion for summary judgment on plaintiff's
claim for violation of the NJLAD will be granted.

**D.   Malicious Prosecution**

Under New Jersey law, a plaintiff bringing a claim for
malicious prosecution must prove: "(1) that the criminal action
was instituted by the defendant against the plaintiff, (2) that
it was actuated by malice, (3) that there was an absence of

probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff." Brunson v. Affinity Federal Credit Union, 199 N.J. 381, 394, 972 A.2d 1112, 1119 (N.J. 2009) (citations omitted). "It is beyond doubt that '[t]he plaintiff must establish each element[ and that, u]pon failure to prove any one, the cause must fail.'" Id. (citing Lind v. Schmid, 67 N.J. 255, 262, 337 A.2d 365 (1975)). "It is understood that '[t]he essence of the cause of action is lack of probable cause[.]'" Id. "Particularly, '[t]he plaintiff must establish a negative, namely, that probable cause did not exist.'" Id.

In New Jersey, "malicious prosecution is not a favored cause of action because citizens should not be inhibited in instituting prosecution of those reasonably suspected of crime." Id. (citations omitted). In assessing a claim for malicious prosecution, the Court must strike a balance between "encouraging the orderly resolution of disputes and preventing the abuses that may result therefrom." Id. at 395.

Plaintiff has failed to prove the first three elements of his malicious prosecution claim.[5] With regard to the first element, that a criminal action was instituted against him by the Hilton, it was the Division of Gaming Enforcement ("DGE") who

---

[5]   Plaintiff has proven the final element that the criminal action was terminated in his favor.  On October 3, 2008, the Honorable Bruce F. Weekes, Municipal Court Judge in Atlantic City, found plaintiff not guilty of the charge of disorderly conduct.

responded to the call from the Hilton and who issued the citation against the plaintiff.  In <u>Myrick v. Resorts Intern. Casino & Hotel</u>, 319 N.J.Super. 556, 564-65, 726 A.2d 262, 267 (App.Div. 1999), the court found that the DGE "is a division of the Department of Law and Public Safety and is clearly not an agent of the casino."  <u>Id.</u> (determining that it was the DGE's decision to arrest plaintiff and that the casino defendant did not institute the proceedings against plaintiff).

Even if the actions of the Hilton could be considered to have instituted the criminal action, plaintiff has not plead facts that could prove the second and third elements of his malicious prosecution claim.  With regard to the second and third elements, plaintiff must be able to show that the criminal action was actuated by malice, and that there was an absence of probable cause.  New Jersey courts define probable cause as "facts such as to lead a person of ordinary prudence to believe on reasonable grounds the truth of the charge at the time it was made."  <u>Brunson</u>, 972 A.2d at 1121.

Plaintiff was arrested for disorderly conduct.  The New Jersey disorderly conduct statute provides, in pertinent part:

> a. Improper behavior. A person is guilty of a petty disorderly persons offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he
>
> (1) Engages in fighting or threatening, or in violent or tumultuous behavior;

N.J. Stat. Ann. § 2C-33:2(a)(1).

Here, a guest at the Hilton personally identified plaintiff as the person who had asked her for money.  This identification provided probable cause for the Hilton to start an investigation.  While in the course of this investigation, plaintiff became boisterous, started yelling and waving his arms, and was disruptive to other patrons in the casino.  Ms. Feldman testified that she felt intimidated by plaintiff and that his behavior was threatening towards her.  Ms. Feldman testified that she felt threatened for her life and called for backup.  Mr. Cundari testified that he responded to Ms. Feldman's call for back up and witnessed plaintiff yelling and being disruptive.  Mr. Cundari testified that he told plaintiff to calm down and that if he did not calm down he would be ejected from the casino.  Mr. Cundari testified that plaintiff continued to act in a boisterous manner and refused to leave even though he was advised that he would be charged with trespassing or disorderly conduct.  Ms. Dixon testified that she saw plaintiff gesturing with his hands towards Ms. Feldman.  Ms. Dixon testified that plaintiff and Ms. Feldman were engaged in a loud verbal exchange and were "going at each other."

Based on these facts, probable cause existed to charge plaintiff with disorderly conduct.  The type of behavior exhibited by plaintiff could be considered "tumultuous."  See

24

N.J. Stat. Ann. § 2C-33:2(a)(1) (a person is guilty "... if with
purpose to cause public inconvenience, annoyance or alarm, or
recklessly creating a risk thereof he ... [e]ngages in ...
tumultuous behavior."). Tumultuous is defined as "marked by
tumult." See Merriam-Webster's Collegiate Dictionary, 11th ed.
(2006). Tumult is defined as "disorderly agitation or milling
about of a crowd usu. uproar and confusion of voices: COMMOTION."
See id. Based on the testimony of the witnesses describing
plaintiff's agitated behavior and his refusal to calm down when
asked, or to leave the premises when asked, there was probable
cause to charge plaintiff with disorderly conduct. Also,
plaintiff has failed to allege facts that could show that those
Hilton employees like Mr. Cundari who acted without racial animus
acted with malice in initiating charges of disorderly conduct.
See Morales v. Busbee, 972 F.Supp. 254, 261 (D.N.J. 1997)
("Actual malice in the context of malicious prosecution is
defined as either ill will in the sense of spite, lack of belief
by the actor himself in the propriety of the prosecution, or its
use for an extraneous improper purpose.").

    Therefore, defendant's motion for summary judgment on
the claim of malicious prosecution will be granted.

## E.  Intentional Infliction of Emotional Distress

    To establish a claim for intentional infliction of
emotional distress ("IIED"), the plaintiff "must establish

intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe". Buckley v. Trenton Savings Fund Society, 111 N.J. 355, 366, 544 A.2d 857, 863 (N.J. 1998) (citing M. Minzer, Damages in Tort Actions, vol. I, § 6.12 at 6-22 (1987) (Minzer)). To state a claim of IIED, a plaintiff must prove four elements. The first element requires that a plaintiff prove that "defendant acted intentionally or recklessly." Id. "For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress." Id. "Liability will also attach when the defendant acts recklessly in deliberate disregard of a high degree of probability that emotional distress will follow." Id. (citing Hume v. Bayer, 178 N.J.Super. 310, 428 A.2d 966 (Law Div. 1981)). The second element of the claim requires that the conduct be "extreme and outrageous." Id. "The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (citing Caputzal v. The Lindsay Co., 48 N.J. 69, 77-78, 222 A.2d 513 (1966); Minzer, supra, § 6.12[2] at 6-22). "Third, the defendant's actions must be the proximate cause of the plaintiff's distress." Id.

Lastly, the forth element requires that the distress must be "so severe that no reasonable man could be expected to

26

endure it." Id. (citing Restatement (Second) of Torts, § 46 comment k (1965)). In New Jersey, the "emotional distress must be sufficiently substantial to result in either physical illness or serious psychological sequelae". Turner, 363 N.J. Super. at 200, 832 A.2d at 348 (citing Aly v. Garcia, 333 N.J.Super. 195, 204, 754 A.2d 1232 (App.Div. 2000), certif. denied, 167 N.J. 87, 769 A.2d 1050 (2001)). "The standard is an objective one." Id. "Whenever an intentional infliction of emotional distress claim arises out of conduct that also constitutes invidious discrimination on the basis of 'race' ..., the average person standard must be adapted to reflect those characteristics of the plaintiff that are the focus of the alleged discrimination." Id.

"The severity of the emotional distress raises questions of both law and fact." Buckley, 111 N.J. at 367, 544 A.2d at 864. "Thus, the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved." Id. Here, although plaintiff has alleged sufficient facts to go to a jury on elements three and four of his IIED claim, he has not alleged sufficient facts in support of elements one and two.

With regard to the third and fourth elements, plaintiff has presented evidence that five days after the incident at the Hilton, he was treated at the AtlantiCare Regional Medical Center. The psychiatric intervention program patient assessment

27

form states that plaintiff is a retired Army Lt. Colonel and
referred himself to the ER for recurrent "PTSD."[6]  The assessment
form includes a brief description of the incident at the Hilton
on December 29, 2007, and states that plaintiff became so angry
following the Hilton incident that he started having flashbacks
of the Viet Nam war.  Plaintiff was medically cleared on the same
day and proscribed Prozac for fourteen days.  Plaintiff also
attended a few counseling sessions with the Baltimore Veterans
Center.  However, plaintiff also testified that within a month or
so after the incident it was "completely out of his mind."

Plaintiff also states that following the hearing in
Atlantic City Municipal Court in which he was found not guilty,
he wrote to the Hilton describing what had happened at the
hearing and included a copy of his closing argument.  The Hilton
responded by calling the New Jersey State Police and filing a
complaint for terroristic threats.  After interviewing plaintiff
on the telephone, plaintiff testified that he was told by the
police officer that the complaint had no basis and the matter was
closed.  Plaintiff testified that the call from the police "set
him back" but that he "dismissed these people [Hilton] as
idiots."

Defendant argues that plaintiff's treatment at the

---

[6]    The Court assumes this to be an acronym for post
traumatic stress disorder.

AtlantiCare Regional Medical Center was from flashbacks from his
service in Viet Nam and was not due to the incident at the
Hilton.  Defendant also points out that plaintiff states he did
not suffer any emotional distress after he sent the letter to the
Hilton the following October.  Whether the incident at the Hilton
triggered flashbacks would be a question of fact for the jury.
See Bennis v. Gable, 823 F.2d 723, (3d Cir. 1987) ("Questions of
fact can only be properly decided by a jury.").  The severity of
plaintiff's emotional distress would also be a question for the
jury.  Id.  However, since plaintiff has failed to allege
sufficient facts to meet elements one and two, his IIED claim
must nevertheless fail.

        Plaintiff has not established sufficient facts in
support of the first and second element of his IIED claim.  With
regard to the first element, plaintiff has not shown that the
Hilton acted intentionally or recklessly to cause him severe
emotional distress.  There are no facts that show that defendant
intended to cause plaintiff emotional distress.  Rather the
intention of the defendant was to investigate a claim of
panhandling and then subsequently to restore order on its
premises.

        Plaintiff has also failed to establish sufficient facts
that could prove the second element, that the Hilton's conduct
was "outrageous."  See Ingraham v. Ortho-McNeil Pharmaceutical,

422 N.J.Super. 12, 21, 25 A.3d 1191, 1195 (App.Div. 2011)
(referring to the second element as having an "'elevated
threshold' that is satisfied only in extreme cases.") (citing
Griffin v. Tops Appliance City, Inc., 337 N.J.Super. 15, 23, 766
A.2d 292 (App.Div. 2001)).

In Ingram, the New Jersey Superior Court summarized
cases in which the court found conduct that satisfied the second
element of outrageous conduct to be: "1) a county sheriff's using
an atrocious racial slur to refer to an African-American
employee, Taylor v. Metzger, 152 N.J. 490, 508-21, 706 A.2d 685
(1998); (2) a defendant teacher's false report that the plaintiff
teacher, a practicing non-violent Buddhist, had threatened to
kill her students, and arranging to have the plaintiff removed
publicly from the school, allegedly in retaliation for rebuking
the defendant's sexual advances, Leang v. Jersey City Bd. of
Educ., 198 N.J. 557, 568, 587-88, 969 A.2d 1097 (2009); (3) a
supervisor and two co-workers at a military facility surrounding
the plaintiff and making comments and gestures to suggest that
she was to perform a sexual act on the supervisor while the
others watched, followed by a threatening telephone call implying
that the Mafia would become involved if the plaintiff pursued the
investigation, Wigginton v. Servidio, 324 N.J.Super. 114, 119-20,
123, 130-32, 734 A.2d 798 (App.Div. 1999), certif. denied, 163
N.J. 11, 746 A.2d 457 (2000); (4) a landlord's intentional

30

shutting off heat, running water, and security in a
rent-controlled building in an effort to induce the tenants to
vacate, <u>49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc.</u>, 227
N.J.Super. 449, 455-57, 466, 471-75, 547 A.2d 1134, (App.Div.
1988); and (5) a doctor's allegedly telling parents that their
child was 'suffering from a rare disease which may be cancerous
knowing that the child has nothing more than a mildly infected
appendix,' <u>Hume v. Bayer</u>, 178 N.J.Super. 310, 319, 428 A.2d 966
(Law Div. 1981)." <u>Ingraham</u>, 422 N.J.Super. at 21, 25 A.3d at
1195-96.[7]

_____

[7]     Cases in which New Jersey courts did <u>not</u> find
outrageous conduct include: "(1) the decedent's children from an
earlier marriage were not informed about and thus excluded from a
viewing at the funeral home after the decedent was murdered, <u>Cole
v. Laughrey Funeral Home</u>, 376 N.J.Super. 135, 147-48, 869 A.2d
457 (App.Div.2005); (2) a supervisor expressed doubt that the
plaintiff had been diagnosed with breast cancer, and then came
near her "on the verge of physically bumping into [the
plaintiff's] breast area as if to see" if she truly had a
mastectomy, <u>Harris v. Middlesex County College</u>, 353 N.J.Super.
31, 36, 46-47, 801 A.2d 397 (App.Div.2002); (3) managers at an
appliance retailer brought theft charges against the plaintiff
sales manager for selling a television to his brother-in-law
below cost, <u>Griffin v. Tops Appliance City, Inc.</u>, 337 N.J.Super.
15, 20-25, 766 A.2d 292 (App. Div.2001); and (4) the defendant in
a divorce case had a long-term adulterous affair with her boss,
<u>Ruprecht v. Ruprecht</u>, 252 N.J.Super. 230, 236-38, 599 A.2d 604
(Ch.Div. 1991)." <u>Id.</u> (finding that althoug conduct was
insensitive and perhaps negligent of plaintiff's vulnerability in
her continuing bereavement, the conduct described did not meet
the requisite standard to support a claim of intentional
infliction of emotional distress). <u>Ingraham</u>, 422 N.J.Super. at
21, 25 A.3d at 1195-96.

    Likewise, federal courts have <u>not</u> found outrageous
conduct where: "(1) the plaintiff, a detective, was subjected to
unusual discipline, including that he present himself for a

Here, plaintiff has not established sufficient facts that could show that defendant's conduct was so outrageous as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  See Buckley, 111 N.J. at 366, 544 A.2d at 863.  The Hilton received a complaint from a patron that plaintiff had asked her for money.  Hilton began an investigation into the charge.  Although plaintiff denied the charge, which was in fact an erroneous identification, he initially cooperated in the investigation.  After Ms. Feldman asked for plaintiff's Hilton Elite Player card, however, plaintiff engaged in disruptive behavior.  Whether Ms. Feldman's intention in asking for plaintiff's card was racially motivated or not, the act of requesting his card during an investigation is not so outrageous an act as to go beyond all possible bounds of decency, particularly where there was a notation under his account stating "Notify Surveillance and Shot

_____

psychiatric evaluation, Zamboni v. Stamler, 847 F.2d 73, 76, 80 (3d Cir.), cert. denied, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 233 (1988); (2) the plaintiff's co-workers treated her rudely and unprofessionally, called her names, and gestured in a physically intimidating manner, Ferraro v. Bell Atlantic Co., 2 F.Supp.2d 577, 589 (D.N.J. 1998); and (3) derogatory gender-based comments were made to the plaintiff along with allegations that her fiancé was a "cheat" and a "liar," Obendorfer v. Gitano Group, Inc., 838 F.Supp. 950, 952, 955 (D.N.J. 1993)."  Id.

32

Shift Manager to observe all slot play."

Furthermore, while Ms. Feldman had possession of his card, plaintiff began yelling, gesturing with his hands towards Ms. Feldman, and causing a disruption on the casino floor. Plaintiff was asked to calm down which he refused to do. Plaintiff was also asked to leave the premises which he refused to do. The actions by the Hilton employees in removing plaintiff from the casino floor, and subsequently initiating a disorderly conduct charge, were again not so outrageous as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Rather, their actions were to restore order inside the casino. Keeping order on the casino floor ensures the safety of the patrons and of the staff. Thus, defendant's motion for summary judgment with regard to plaintiff's claim for intentional infliction of emotional distress will be granted.

## IV.  CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment will be granted.

 Noel L. Hillman
NOEL L. HILLMAN, U.S.D.J.

Date: December 27, 2011
At Camden, New Jersey

33